IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, | CV 25-05-BLG-TJC |
| Plaintiff/Counterdefendant, | **ORDER** |
| vs. | |
| FRANZ CONSTRUCTION, INC.; GRIZZLY COIL TUBING SERVICES, INC.; ARLON FRANZ; and DON FRANZ, | |
| Defendants/Counterclaimants. | |

Plaintiff St. Paul Fire & Marine Insurance Company ("St. Paul") filed this action against Defendants Franz Construction, Inc. ("Franz Construction"), Grizzly Coil Tubing Services, Inc. ("Grizzly"), Arlon Franz ("Arlon"), and Don Franz ("Don") (collectively, "Defendants"), seeking declaratory judgment as to its duty to defend and indemnify Defendants in an underlying federal court action in the United States District Court for the District of North Dakota, brought by Timothy Michael Drever ("Drever"), Patriot Coil Services USA Corp., n/k/a Raven Well Services USA Corp. ("Patriot Coil"), and Patriot Equipment Ltd. ("Patriot Equipment") (collectively, "North Dakota Plaintiffs").  (Doc. 1.)

/ / /

1

Presently before the Court is St. Paul's Motion for Summary Judgment, seeking a declaration that it does not owe a duty to defend or indemnify Defendants in the underlying lawsuit.  (Doc. 22.)  The motion is fully briefed and ripe for the Court's review.  (*See* Docs. 23, 25, 29.)  Having considered the parties' submissions, the Court finds St. Paul's motion should be **GRANTED**.

## I.    BACKGROUND

On April 30, 2024, North Dakota Plaintiffs filed a lawsuit in the United States District Court for the District of North Dakota, Cause No. 1:24-cv-00072-DLH-CRH (the "Underlying Lawsuit"), naming Arlon, Don, and Grizzly as defendants.  (Doc. 1-1.)  Franz Construction was not named as a party.  The Underlying Lawsuit involves businesses that provide equipment and services related to coil tubing, a type of flexible tubing used by oil and gas companies to facilitate hydraulic fracturing operations.  The Underlying Complaint alleges that Drever and Bradley Isfeld owned and operated a Canadian coil tubing business and, in 2016, formed Patriot Coil and Patriot Equipment to engage in the coil tubing business in North Dakota.  (*Id.* at ¶ 9.)  In essence, North Dakota Plaintiffs allege that Arlon, Don, and Grizzly subsequently engaged in a fraudulent conspiracy to steal from and take over these American coil tubing businesses.

The Underlying Complaint alleges in relevant part:

14.    In or around September 2016, Patriot Coil leased a bay from Arlon Franz at a building owned by Arlon Franz in Watford City,

2

North Dakota, with the intent of operating its business out of that bay.

15.    In or about late April 2017, Mr. Drever and Mr. Isfeld offered Arlon Franz a 1/3 ownership interest in Patriot Coil for the sum of US $125,000. Arlon Franz accepted, and paid the requested sum, thereafter becoming a shareholder in Patriot Coil.

…

16.    After becoming a shareholder of Patriot Coil, Arlon Franz gained knowledge of Patriot Coil's employees, customers, and operations. Upon information and belief, Arlon Franz shared this knowledge with Don Franz.

…

18.    In or around May 2018, Arlon Franz, without providing notice to Mr. Drever or any other Patriot Coil shareholder, used his knowledge of Patriot Coil's employees, customers, and operations that he acquired as a shareholder of Patriot Coil to take over Patriot Coil's employees, customers, and equipment and transfer those employees, customers, and equipment to Grizzly. Among other things:

> a.    Arlon Franz hired all but one of Patriot Coil's employees to Grizzly.
> b.    Grizzly took over all of Patriot Coil's existing MSAs [master service agreements] without Patriot Coil's consent and took over Patriot Coil's work and redirected all revenue to Grizzly.
> c.    Arlon Franz appropriated Patriot Equipment and Patriot Coil's equipment and Grizzly used it to service Patriot Coil's customers under Patriot Coil's existing MSAs taken by Grizzly.

19.    Upon information and belief, Don Franz provided funding, assistance and encouragement to Arlon Franz with the intention of facilitating Arlon Franz taking over Patriot Coil's employees, customers, and equipment and transfer of those employees, customers, and equipment to Grizzly.

20.    Upon information and belief, Don Franz has a controlling interest in Grizzly.

21.    Upon information and belief, in or about May 2018, Arlon

Franz fraudulently forged Mr. Drever's signature on wire transfer forms and used those forms to transfer funds from Patriot Coil's bank account at the Watford City Bank to its account at the Yellowstone Bank, for which Arlon Franz had signing rights.

22.    Arlon Franz subsequently transferred funds without Patriot Coil's knowledge or consent to himself, Don Franz, and/or Grizzly.

23.    Upon information and belief, Arlon Franz took and detained equipment belonging to Patriot Coil and/or Patriot Equipment and exercised dominion over that equipment by having Grizzly take possession of the equipment and making use of the equipment.
…
25.    Upon information and belief Arlon Franz forged Mr. Drever and/or Mr. Isfield's [sic] signature on documentation transferring title of the above-referenced equipment and used this fraudulent documentation to transfer equipment belonging to Patriot Coil to Grizzly.

(*Id.* at 3–6.)

The Underlying Complaint brings ten causes of action based on this alleged conduct: Breach of Fiduciary Duty; Aiding and Abetting Breach of Fiduciary Duty; Misappropriation of Corporate Opportunity; Conversion; Conversion (Conspiracy); Fraud; Fraud (Conspiracy); Tortious Interference with a Contract; Tortious Interference with a Contract (Conspiracy); and Unjust Enrichment.  The North Dakota Plaintiffs seek approximately $23 million in damages.  (Doc. 29 at 15.)

On July 25, 2024, Arlon, Don, and Grizzly submitted a notice of claim to St. Paul seeking defense and indemnity in the Underlying Lawsuit under two policies: a policy issued to Franz Construction, No. ZLP-14P89828-18-N4 ("Franz

Construction Policy"); and a policy initially issued to Arlon that was later amended to cover Grizzly, No. ZPP-91M81929-17-N4 ("Grizzly Policy").[1]  (Doc. 26 at 5; Doc. 18 at ¶¶ 9–10.)

The Franz Construction Policy and the Grizzly Policy include commercial general liability coverage and excess coverage.  The relevant language of the policies is identical and provides:

**What This Agreement Covers**

**Bodily injury and property damage liability**. We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that:
- happens while this agreement is in effect; and
- is caused by an event.

*Protected person* means any person or organization that qualifies as a protected person under the Who Is Protected Under This Agreement section.
…
*Event* means an accident, including:
- continuous or repeated exposure to substantially the same general harmful conditions; and
- a sudden and accidental pollution incident.
…
**Who Is Protected Under This Agreement**

---

[1] In their Statement of Disputed Facts, Defendants purportedly dispute that these were the only two policies under which defense and indemnity were sought, stating: "Defendants tendered to St. Paul under any and all policies held by them." (Doc. 26 at 5.)  But Defendants do not identify any other relevant policy Defendants had with St. Paul.  Moreover, Defendants admitted in their Answer (Doc. 5 at 1), and stated in the parties' Statement of Stipulated Facts (Doc. 18 at ¶ 9), that these were the two policies tendered by Defendants to St. Paul.  Thus, the basis and purpose of Defendants' subsequent disputation is unclear.

…
**Corporation or other organization.** If you're shown in the
Introduction as a named insured and a corporation or an other
organization, you're a protected person. Your directors and executive
officers are protected persons only for the conduct of their duties as
your directors or executive officers. And your stockholders are
protected persons only for their liability as your stockholders.

(Doc. 1-2 at 81, 88–89, 292–93, 302–03; Doc. 1-3 at 43, 50–51, 210–11, 220–21)

(emphases in originals).

The policies also contain the following relevant exclusion:

**Exclusions - What This Agreement Won't Cover**
…
**Expected or intended bodily injury or property damage.** We won't
cover bodily injury or property damage that's expected or intended by
the protected person.

(Doc. 1-2 at 95, 103, 309, 315; Doc. 1-3 at 57, 65, 227, 233) (emphases in

originals).

On July 30, 2024, St. Paul acknowledged Defendants' claim with a phone

call and a follow up email.  (Doc. 26 at 5.)  The email stated, in part:

Based on our brief discussion, it does not appear based on the
allegations in the complaint or from our discussion that Franz
Construction had anything to do with this loss or the operations of
Grizzly Coil Tubing Services, Inc.
…
At this time, Travelers is reviewing the allegations contained in the
complaint and the relevant policies for Grizzly Coil Tubing and for
Franz Construction. Do [sic] to the nature of the allegations in the
complaint, we may not have a completion of the coverage review
prior to the answer date of the suit. It is strongly recommended that
you contact your personal attorney who is familiar with these types of
cases to file the appropriate response or answer the lawsuit to avoid

any default judgement [sic] being taken. Once Travelers has made a
coverage decision we will advise you of the same.

(Doc. 24-2.)

Arlon, Don, and Grizzly retained the services of attorney Steven J. Leibel
("Leibel") to jointly represent them in the Underlying Lawsuit. On September 4,
2024, Leibel filed an answer to the Underlying Complaint. *Drever v. Franz*, No.
1:24-cv-00072-DLH-CRH, Dkt. No. 4 (D.N.D.).

On September 24, 2024, St. Paul sent Arlon, Don, and Grizzly a letter
indicating that it would provide a defense for these parties in the Underlying
Lawsuit under the Grizzly Policy, subject to a reservation of rights. (Doc. 24-3.)
St. Paul agreed to pay Leibel to continue to defend the Underlying Lawsuit. (Doc.
26 at 6.)

On September 25, 2024, St. Paul notified Arlon and Don that it was denying
the duty to defend them under the Franz Construction Policy on the basis that the
Underlying Complaint did not seek liability from Arlon and Don based on their
duties as directors or executive officers of Franz Construction. (Doc. 24-7 at 1.)

On October 29, 2024, however, counsel for Franz Construction sent a letter
to St. Paul asking it to reconsider its denial. (Doc. 24-8.) The letter included
North Dakota Plaintiffs' initial disclosures in the Underlying Lawsuit (Doc. 24-8 at
3–9), as well as an agreement between Patriot Coil and Franz Construction dated
June 21, 2017 (Doc. 25-2 at 3). The initial disclosures list an individual as the

7

Controller for Franz Construction, and state that individual has knowledge of information "related to the factoring agreement between Patriot Coil and an entity controlled by Don and Arlon Franz." (Doc. 24-8 at 4.)  The agreement provides that "Patriot Coil Services USA Corp has retained the financial services of Franz Construction Inc. Therefore, effective June 21, 2017, all invoices of Patriot Coil Services USA Corp will be assigned and processed through Franz Construction Inc." (Doc. 25-2 at 3.)  The agreement is signed by Don Franz on behalf of Franz Construction Inc. and Bradley Isfeld on behalf of Patriot Coil Services USA Corp. (*Id*.)  On November 7, 2024, St. Paul rescinded its denial of coverage under the Franz Construction Policy, and agreed to pay for Leibel to defend Arlon and Don under this policy as well, subject to a reservation of rights.  (Doc. 24-9.)

Arlon also had a policy with EMC Insurance ("EMC"), under which he was receiving a defense in the Underlying Lawsuit.  Therefore, St. Paul entered an agreement with EMC whereby St. Paul would pay 67% of Leibel's costs and EMC would pay the remaining 33%.  (Doc. 26 at 6–7.)

In December 2024, after potential conflicts between Arlon and Don were identified, Leibel withdrew from representation in the Underlying Lawsuit, and St. Paul agreed to pay William Harrie to defend Arlon and Jason Vendsel to defend Don and Grizzly.  (*Id.* at 7); *Drever v. Franz*, No. 1:24-cv-00072-DLH-CRH, Dkt. Nos. 13, 14 (D.N.D.).

8

Defendants allege Leibel was not fully reimbursed for the costs of defense in the Underlying Lawsuit until filings in this action made evident that he had not been paid in full.  (Doc. 25 at 4.)  The parties' filings do not make clear when exactly Leibel was paid in full, but Defendants acknowledge that Leibel has been fully paid for providing a defense in the Underlying Lawsuit (*Id.*), and St. Paul acknowledges that full payment to Leibel was delayed (Doc. 29 at 12).

Defendants also allege that, as late as July 2025, St. Paul had not fully reimbursed Don for the initial defense costs he incurred in the time between July 25, 2024—when St. Paul received Defendants' tender—and September 24, 2024— when St. Paul agreed defend under a reservation of rights.  (Doc. 26 at 11.)  On July 31, 2025, St. Paul issued Don a check for $3,300, the amount Defendants alleged was unreimbursed.  (Doc. 29-1.)  St. Paul contends that the $3,300 was actually owed to Don by EMC and that "St. Paul has actively been trying to identify the fees Defendants claim are unpaid," but that "Defendants have been reluctant to fully disclose what fees it is they claim remain unreimbursed."  (Doc. 29 at 14.)  Whatever the reasons for the delays in payment to Don and to Leibel, St. Paul has now reimbursed all defense costs incurred prior to its September 24, 2024, agreement to provide a defense.

On January 7, 2025, St. Paul filed this action seeking a declaration that it does not owe a duty to defend or indemnify Defendants for the claims made in the

Underlying Lawsuit. (Doc. 1.) On January 27, 2025, Defendants filed a counterclaim against St. Paul seeking, among other things, a declaration that St. Paul forfeited the right to invoke policy rights and defenses by materially breaching its duty to defend. (Doc. 5.)

## II.    DISCUSSION

St. Paul now moves for summary judgment on the grounds that its duty to defend is not triggered because the claims in the Underlying Complaint do not allege an "accident" as that term is used in the policies, and furthermore, that coverage is barred by the policies' "expected or intended" exclusion. St. Paul also argues that the duty to defend under the Franz Construction Policy is not triggered because the Underlying Complaint makes no allegations against a "protected person" under the policy. Moreover, St. Paul asserts that it has not waived any coverage defenses. Therefore, St. Paul seeks a declaration that it has no duty to defend or indemnify Defendants.

Defendants argue that St. Paul has failed to establish that the Underlying Complaint unequivocally demonstrates that the claims fall outside the policies' coverage. Additionally, Defendants contend that St. Paul breached its duty to defend and thereby forfeited its ability to invoke policy defenses. Defendants also argue, in the alternative, that the materiality of St. Paul's breach is a question of fact that precludes the entry of summary judgment.

## A.    Legal Standards

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In ruling on a motion for summary judgment, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *Id.* at 587.

/ / /

/ / /

/ / /

11

### B.    Duty to Defend

The Court's jurisdiction over this action is based on diversity of citizenship; thus, the Court must apply the substantive law of Montana.[2] *Med. Lab'y Mgmt. Consultants v. Am. Broad. Cos.*, 306 F.3d 806, 812 (9th Cir. 2002).  In Montana, the interpretation of an insurance contract is a question of law.  *Scentry Biologicals, Inc. v. Mid-Continent Cas. Co.*, 319 P.3d 1260, 1264 (Mont. 2014).

It is well-settled in Montana that an insurer's duty to defend is independent from and broader than its duty to indemnify.  *Farmers Union Mut. Ins. Co. v. Staples*, 90 P.3d 381, 385 (Mont. 2004).  The "duty to defend arises when a complaint against an insured alleges facts, which if proved, would result in coverage."  *Tidyman's Mgmt. Servs., Inc. v. Davis*, 330 P.3d 1139, 1149 (Mont. 2014) (citing *Staples*, 90 P.3d at 385); *State Farm Mut. Auto. Ins. Co. v. Freyer*, 312 P.3d 403, 410–11 (Mont. 2013).  Whereas the duty to indemnify "arises only if coverage under the policy is actually established."  *Freyer*, 312 P.3d at 410–11.

The determination of whether an insurer has a duty to defend is made by comparing the factual allegations in the complaint to the coverage afforded under the policy.  *Graber v. State Farm Fire & Cas. Co.*, 797 P.2d 214, 217 (Mont. 1990); *Staples*, 90 P.3d at 385.  "[I]t is the acts giving rise to the complaint which

---

[2] The parties also agree that Montana law, not North Dakota law, should apply. (Doc. 23 at 9; Doc. 25 at 4.)

12

form the basis for coverage, not the complaint's legal theories or conclusory language." *Town of Gerladine v. Mont. Mun. Ins. Auth.*, 198 P.3d 796, 800 (Mont. 2008). In comparing allegations of liability with policy language, "a court must liberally construe allegations in a complaint so that all doubts about the meaning of the allegations are resolved in favor of finding that the obligation to defend was activated." *Staples*, 90 P.3d at 385. The "fundamental protective purpose of an insurance policy," paired with the insurer's obligation to provide a defense, require coverage exclusions to be narrowly construed. *Id*. Therefore, the insurer must "construe the factual assertions from the perspective of the insured." *Id.* "Where a complaint alleges facts which represent a risk outside the coverage of the policy but also avers facts which, if proved, represent a risk covered, the insurer is under a duty to defend." *Id.*

"Where a claim falls unequivocally outside the policy's coverage, however, there is nothing for the court to construe, and no reason to impose a duty to defend." *Lloyd A. Twite Fam. P'ship v. Unitrin Multi Line Ins.*, 192 P.3d 1156, 1160 (Mont. 2008). Accordingly, the insurer has a duty to defend unless there is an "unequivocal demonstration that the claim against an insured does not fall within the insurance policy's coverage." *Staples*, 90 P.3d at 385. Where there is any dispute as to the facts relevant to coverage, the dispute must be resolved in favor of finding a duty to defend. *Id.* at 386.

1. **Whether the Allegations in the Underlying Complaint Trigger the Duty to Defend**

Defendants bear the burden of proving the allegations in the Underlying Complaint comprise actions that potentially fall within the policies' initial grant of coverage. *Travelers Cas. & Sur. Co. v. Ribi Immunochem Rsch., Inc.*, 108 P.3d 469, 476 (Mont. 2005) ("We agree with those courts that have allocated the initial burden to the insured to establish that the claim falls within the basic scope of coverage and shifted to the insurer the burden to establish that the claim specifically is excluded.").

The policies cover "bodily injury or property damage that … is caused by an event." (Doc. 1-2 at 81; Doc. 1-3 at 43.) The polices provide that "[e]vent means an accident." (*Id.*) Montana law defines "accident" as an "unexpected happening that occurs without intention or design on the part of the insured." *Safeco Ins. Co. of Am. v. Liss*, 16 P.3d 399, 405 (Mont. 2000). The Montana Supreme Court has clarified, however, that an accident may include intentional acts so long as the harmful consequences of those acts were not objectively intended or expected from the standpoint of the insured. *Emps. Mut. Cas. Co. v. Fisher Builders, Inc.*, 371 P.3d 375, 378–80 (Mont. 2016).

The Court in *Fisher* analyzed the term "occurrence" instead of "event" because "occurrence" was the term used by the policy at issue in that case. Nevertheless, both "occurrence" in the policy at issue in *Fisher* and "event" in the

14

policies at issue here are defined as an "accident." In its opinion in *Fisher*, the

Court established the following two-part test to determine whether the conduct in

question was an accident under the policy: "1) whether the act itself was

intentional, and 2) if so, whether the consequence or resulting harm stemming from

the act was intended or expected from the actor's standpoint." *Id.* at 378. If the

answer to either question is no, then the act is an accident. *Id.* The question under

the second prong is an objective inquiry. *Id.* at 379. That is, whether a reasonable

person in the insured's position could objectively expect their actions to cause

harm. *Id.*

St. Paul argues that, applying the *Fisher* test, all conduct alleged in the

Underlying Complaint is intentional and the resultant harm was expected. (Doc.

23 at 14–17.)

Defendants counter that "the conduct allegations [in the Underlying

Complaint] are individually directed at Arlon Franz, not Don Franz," and that

because "no specific allegation of conduct is leveled at Don Franz," it is reasonable

to conclude that "Don's involvement was passive, and therefore not intentional."

(Doc. 25 at 5–6.)

This characterization of the Underlying Complaint's allegations against Don

is not entirely accurate. While the Underlying Complaint focuses more on Arlon

than Don, it does include an allegation of intentional conduct by Don. The

Underlying Complaint alleges that Don has a controlling interest in Grizzly, and that Don "provided funding, assistance and encouragement to Arlon Franz with the intention of facilitating Arlon Franz taking over Patriot Coil's employees, customers, and equipment and transfer of those employees, customers, and equipment to Grizzly." (Doc. 1-1 at ¶ 19.)  This conduct cannot be said to be passive and unintentional.  The other allegations involving Don relate to his receiving information and/or funds from Arlon, and thus allege acts done by Arlon, not Don.  (*Id.* at ¶¶ 16, 22.)  Although the Underlying Complaint's allegations as to Don are somewhat sparse, they do allege intentional conduct, and do not in any way suggest unintentional or accidental conduct.

Thus, the question then becomes whether a reasonable person in Don's position could expect harm to result to the North Dakota Plaintiffs from the act of funding, assisting, and encouraging Arlon's takeover of the North Dakota Plaintiffs' employees, customers, and equipment.  The harms that resulted to the North Dakota Plaintiffs from Don's alleged intentional conduct are precisely those that would be expected: the loss of employees, customers, and equipment.  There is no other conceivable intended result of these alleged acts.  Thus, Don's alleged conduct does not constitute an "event" under the policies.

As to Arlon, Defendants do not dispute St. Paul's contention that the Underlying Complaint solely alleges intentional conduct done with the expectation

of harm, nor does an objective reading of the Underlying Complaint leave open any other possibility. Therefore, none of the conduct alleged in the Underlying Complaint constitutes an "event" covered by the policies. Accordingly, the Underlying Complaint unequivocally demonstrates that the alleged actions fall outside the scope of the policies' coverage and, therefore, St. Paul does not have a duty to defend in the Underlying Action.

Furthermore, because the relevant coverage language under the Franz Construction and Grizzly Policies is identical, the Court need not address the parties' arguments as to whether the actions Don allegedly undertook were in his capacity as an executive of Franz Construction or of Grizzly, as the allegations in the Underlying Complaint would not trigger coverage for him or those entities under either policy.

## 2.    Whether St. Paul is Estopped from Invoking Policy Defenses

The Montana Supreme Court has clearly established that "where an insurer refuses to defend, and does so unjustifiably, the insurer is estopped from denying coverage and becomes liable for defense costs and judgments." *Tidyman's*, 330 P.3d at 1149. As noted above, Defendants assert that St. Paul gave lip service to providing a defense, but then did not timely follow through with either the assumption of the defense or reimbursement for defense costs already incurred. Defendants argue that St Paul's failure to do so constitutes a breach of its duty to

defend, and it is now estopped from denying coverage.

The Court need not reach the issue of whether St. Paul timely and adequately complied with a duty to defend. Coverage by estoppel is only applicable where an insurer unjustifiably refuses to defend. As discussed above, the complaint in this action does not present any potential for coverage under the policies at issue. Thus, St. Paul did not unjustifiably breach a duty to defend. *See e.g., Landa v. Assurance Co. of Am.*, 307 P.3d 284, 289 (Mont. 2013) (complaint's "allegations did not fit within the policy's definition of 'occurrence' and, as a result, did not give rise to a duty to defend"); *Farmers Union Mut. Ins. Co. v. Rumph*, 170 P.3d 934, 938 (Mont. 2007) (where complaint unequivocally demonstrated claim was not covered, no duty to defend arose); *Ribi Immunochem*, 108 P.3d at 479 (as no coverage existed, insurer had no duty to defend); *Wigton v. State Farm Fire and Cas. Co.*, 2022 WL 17829999, at *1 (9th Cir. Dec. 21, 2022) (insurer's decision to forgo declaratory judgment action and deny defense "may have been 'at its peril' but it was not perilous," where claim was excluded from coverage).

Accordingly, Defendants' arguments that St. Paul should be estopped from invoking policy defenses because it breached its duty to defend are mooted by the Court's determination that St. Paul has no duty to defend.

/ / /

18

### C.    Duty to Indemnify

Having determined St. Paul has no duty to defend, the Court likewise finds St. Paul has no duty to indemnify.  Generally, "courts must caution against determining questions of indemnity until liability is established in the underlying proceeding."  *Am. Reliable Ins. Co. v. Vlieland*, 2018 WL 1582551, at *3 (D. Mont. Mar. 30, 2018).  Typically, a claim for declaratory judgment regarding an insurer's duty to indemnify is not ripe until there has been a resolution of the underlying claim.  *Id.* at *3 (finding insurer's motion for summary judgment was "not ripe and justiciable regarding its duty to indemnify" because the underlying state court matter was unresolved); *Nat'l Sur. Corp. v. Mack*, 2016 WL 590453, at *2 (D. Mont. Feb. 11, 2016) ("Courts must refrain from deciding questions of indemnity until liability is established in the underlying proceeding."); *Yellowstone Dev., LLC v. United Fire & Cas. Co.*, 2011 WL 13077970, at *2 (D. Mont. Aug. 11, 2011) (finding claim for declaratory judgment concerning insurer's duty to indemnify was not ripe where the underlying claim remained pending); *Skinner v. Allstate Ins. Co.*, 127 P.3d 359, 363 (Mont. 2005).

Nevertheless, because the duty to defend is more extensive than the duty to indemnify, it is possible for the issue of the duty to defend to resolve a premature indemnity issue.  The Montana Supreme Court has noted that "[w]here there is no duty to defend, it follows that there can be no duty to indemnify."  *Skinner*, 127

19

P.3d at 364.  Thus, "a finding that there is no duty to defend necessarily compels the finding that there is no duty to indemnify."  *Mack*, 2016 WL 590453, at *2. The Montana Supreme Court reaffirmed this rule in *Farmers Insurance Exchange v. Wessel*, 477 P.3d 1101, 1106–07 (Mont. 2020).  There, the district court found the insurer had no duty to defend but stated the duty to indemnify was not ripe because liability had not yet been determined in the underlying action.  *Id.* at 1106. The Supreme Court reversed, stating that "[a] conclusion that there is no duty to defend compels the conclusion that there is no duty to indemnify."  *Id.* at 1107. Accordingly, because St. Paul has no duty to defend, it likewise has no duty to indemnify.

## III.    CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that St. Paul's Motion for Summary Judgment (Doc. 22) is **GRANTED**.

DATED this 12th day of January, 2026.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge